**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Donna Elfers, *et al.*,                                            Case No. 1:14cv171

      Plaintiffs,                                            Judge Michael R. Barrett

          v.

Judith A. Varnau, *et al.*,

      Defendants.

<u>**OPINION & ORDER**</u>

This matter is before the Court upon Defendants Brown County, OH/Brown County Ohio Commissioners' Motion to Dismiss (Doc. 27) and Defendants Dennis Varnau and Judith A. Varnau's Motion to Dismiss (Docs. 28, 30). These motions have been fully briefed. (Docs. 29, 31, 32, 33). In addition, Defendants Dennis and Judith Varnau have filed a Notice of Supplemental Authority. (Doc. 34).

I.    <u>**BACKGROUND**</u>

Plaintiffs are the sister and daughter of Hanson Jones. (Doc. 25, ¶¶ 5, 6). Defendant Dr. Judith Varnau is the Brown County Coroner. Dr, Varnau was called to Jones' home in the early hours of August 8, 2013. (Id., ¶ 13). Dr. Varnau was accompanied her husband, Defendant Dennis Varnau, whom Dr. Varnau had authorized to act on her behalf. (Id., ¶ 14). Dr. Varnau declared Jones' death a suicide and had his body transported to a hospital. Plaintiffs arrived at the house about an hour later. (Id., ¶ 34).

Plaintiffs do not believe Jones committed suicide. (Id., ¶¶30-31, 53-55, 58, 76). Plaintiffs claim the Varnaus prevented investigators from the Brown County Sheriff's

office from investigating the death in order to fuel their political feud with the Brown County Sheriff.  (Id., ¶¶ 18-20, 62-63, 68-71).   Dr. Varnau refused to enter into a standing permissive allowing the Sheriff to investigate.  (Id., ¶¶ 19-20).   Without a permissive order to process a death scene, the Brown County Sheriff has no authority to handle evidence, take custody of bodies, or otherwise process the scenes of suspicious deaths.  (Id., ¶ 20).   As a result, Dr. Varnau had sole custody of the death scene when she ruled Jones' death a suicide.  (Id., ¶¶ 18-20).

According to Plaintiffs, while Dr. Varnau was at the death scene, she instructed EMS personnel to leave pieces of Jones' skull for the family to clean up.  (Id., ¶ 27).   Dr. Varnau also left behind toe tags, body bag wrappers, and the gun used in Jones' death. (Id., ¶¶ 38-39).   Dr. Varnau then intentionally left the door of the house unlocked.   (Id., ¶ 35).

Plaintiffs claim that when they requested that Dr. Varnau retrieve pieces of Jones' skull and reunite them with his body, Dr. Varnau refused, telling them to just dig a hole and bury the pieces.  (Id., ¶¶ 44-45).   Plaintiffs also claim that in a conversation with Mr. Varnau, he told Plaintiffs that "everybody loses someone every day."   (Id., ¶¶ 41-42).

In the Amended Complaint, Plaintiffs bring claims for constitutional violations under 42 U.S.C. § 1983 against all the defendants and claims for negligent and intentional infliction of emotional distress under Ohio law against the Varnaus.

## II.   ANALYSIS

### A.  Standard of Review

When reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, this Court must "construe the complaint in the light most favorable to the plaintiff, accept its

allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. National Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). "[T]o survive a motion to dismiss, a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

### B. <u>Varnau Defendants</u>

#### 1. <u>Abstention</u>

The Varnaus argue that this Court should abstain from deciding Plaintiffs' claims under the *Pullman* abstention doctrine. The Varnaus maintain that Plaintiffs' claims hinge on Dr. Varnau's determination that Jones' death was caused by suicide. The Varnaus argue that the proper course to challenge this finding is in a state court proceeding under Ohio Revised Code § 313.19, which provides:

> The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death.

Ohio Rev. Code § 313.19.

*Pullman* abstention is derived from the Supreme Court's decision in *Railroad*

*Commission of Texas v. Pullman Co.*, 312 U.S. 496, 500-501 (1941).  Application of the *Pullman* abstention doctrine "is warranted only when a state law is challenged and resolution by the state of certain questions of state law may obviate the federal claims, or when the challenged law is susceptible of a construction by state courts that would eliminate the need to reach the federal question."  *GTE N., Inc. v. Strand*, 209 F.3d 909, 921 (6th Cir. 2000).

Plaintiffs do not raise any challenges to Ohio Revised Code § 313.19 itself. Plaintiffs also disavow any challenge to the determination of the "legally accepted cause of death."  Instead, Plaintiffs challenge the way in which that determination was reached in this particular instance.  Plaintiffs claim the Varnaus abandoned body parts and evidence, left the death scene unsecured, disrespected Jones' body and prevented the sheriff from investigating Jones' death.  Certainly there is an implication in Plaintiffs' claims that if Dr. Varnau had performed her responsibilities in a constitutional manner, then the cause of death would have been decided differently, but according to Plaintiffs, their claim is limited to how the cause of death was decided, and not the decision itself. Because there is no question of state law, *Pullman* abstention does not apply.

For similar reasons, the Court finds that abstention under the *Rooker–Feldman* doctrine is not warranted.  Application of the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, (2005).  Here, Plaintiffs are not complaining of injuries caused by a state-court judgment.

4

Therefore, the Court finds that it is not necessary to abstain from exercising jurisdiction over Plaintiffs' claims.

### 2. **Absolute immunity**

The Varnaus argue that they are entitled to absolute immunity from Plaintiffs' constitutional claims. The Varnaus argue that making a determination regarding the cause of death is a quasi-judicial duty which is shielded by absolute immunity. The Varnaus also argue that one who acts under the direction of an absolutely immune official is likewise protected under the doctrine of quasi-judicial immunity.

"A government officer is entitled to absolute immunity for performing functions 'intimately associated with the judicial phase of the criminal process.'" *Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). The Sixth Circuit has explained the general contours of absolute immunity in this context:

> Title 42, Section 1983 of the United States Code creates civil liability for public officials who violate a person's constitutional rights while acting under color of law. The Supreme Court, however, has recognized two kinds of immunity which shield some official actions from liability which might otherwise arise under § 1983. The most common type of immunity is qualified immunity, which protects officials from liability when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). . . . More limited in application, but certainly broader in protection, is absolute immunity, which the Supreme Court has held applies to the performance of certain functions when those functions are integral to the functioning of our adversarial judicial system. *See Briscoe v. LaHue*, 460 U.S. 325, 345, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). The Supreme Court has carefully circumscribed the doctrine, however, because absolute immunity protects an official from liability even when the official acted with knowledge of the constitutional violation. *Id.* Testimony at adversarial judicial proceedings is the most historically grounded of these functions which merit absolute immunity. *See id.*

*Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006) (footnote omitted).   The Sixth Circuit has explained that under this "functional approach" an official's "acts undertaken in direct preparation of judicial proceedings . . . warrant absolute immunity, whereas other acts, such as the preliminary gathering of evidence that may ripen into a prosecution, are too attenuated to the judicial process to afford absolute protection." *Adams*, 656 F.3d at 402 (quoting *Ireland v. Tunis*, 113 F.3d 1435, 1445 (6th Cir. 1997). The Sixth Circuit has cautioned: "Using this approach, courts must look to the nature of the function performed, not the identity of the actor who performed it."   *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010) (internal quotation marks and citation omitted).

Here, Dr. Varnau was not giving testimony at an adversarial proceeding and her decision regarding Jones' cause of death was not taken in direct preparation for judicial proceedings.   The Ohio Supreme Court has described the role of a coroner in determining the cause of death as "a medical expert rendering an expert opinion on a medical question."   *Vargo v. Travelers Ins. Co.*, 34 Ohio St. 3d 27, 30, 516 N.E.2d 226, 229 (Ohio 1987).[1]   Even if Plaintiffs' claims were based upon Dr. Varnau's determination of Jones' cause of death, which Plaintiffs are adamant they are not, the doctrine of absolute immunity offers "no protection to pretrial conduct, including the fabrication of evidence later adopted in trial testimony; that receives only qualified-immunity protection."   *LeFever v. Ferguson*, 567 F. App'x 426, 430 (6th Cir. 2014) (citing *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006) (finding toxicologist entitled to

---

[1]The Court notes that in *Vargo*, the Ohio Supreme Court referred to coroner as engaging in "quasi-judicial activity" when inquiring into the cause of death under Ohio Revised Code § 313.19, but that discussion was in the context of whether the statute was *per se* unconstitutional. 34 Ohio St. 3d at 30, 516 N.E.2d at 229.

absolute immunity because no evidence of pretrial conduct supporting fabrication claim)).

Therefore, the Court finds that the Varnaus are not entitled to absolute immunity from Plaintiffs' Section 1983 claims.

### 3. **Qualified immunity**

The Varnaus argue that they are entitled to qualified immunity from Plaintiffs' Section 1983 claims. Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Sixth Circuit has explained:

> To determine whether a government official is entitled to qualified immunity, we consider the two-part test described in *Saucier v. Katz*, which asks whether "a constitutional right would have been violated on the facts alleged" and, if so, whether the right was "clearly established." 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). We are free to address the second question first, analyzing whether the constitutional right that purportedly prohibited a defendant's conduct was clearly established, without addressing whether there was a constitutional violation at all. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

*Occupy Nashville v. Haslam*, 769 F.3d 434, 442 (6th Cir. 2014) (footnote omitted). To that end, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014); *see also Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996) ( "A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred.").

7

Plaintiffs' constitutional claims under Section 1983 are based on violations of their substantive and procedural due process.

### 4. <u>Substantive due process</u>

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Substantive due process ensures "freedom from government actions that 'shock the conscience.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 2003)).   As the Sixth Circuit has explained:

> Over the years, the courts have used several tropes to explain what it means to shock the conscience. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Conduct shocks the conscience if it "violates the 'decencies of civilized conduct.'" *Id.* at 846, 118 S.Ct. 1708 (quoting *Rochin v. California*, 342 U.S. 165, 172–73, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). Such conduct includes actions "so 'brutal' and 'offensive' that [they do] not comport with traditional ideas of fair play and decency." *Id.* at 847, 118 S.Ct. 1708 (quoting *Breithaupt v. Abram*, 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957)). These are subjective standards, to be sure, but they make clear that the "shocks the conscience" standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation. *See id.* at 847-48, 118 S.Ct. 1708.

*Id.* at 589-590. The Sixth Circuit has recognized that it is difficult to determine where conscious-shocking behavior resides on the continuum of conduct:

> The bookends present the easier cases.   Merely negligent tortious conduct is categorically beneath constitutional due process, but conduct on the other extreme end of the culpability spectrum, that which is "intended to injure" without any justifiable government interest, most clearly rises to the "conscience-shocking" level. [*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998)]. Conduct that is more akin to recklessness or gross recklessness, such as deliberate indifference, is a "matter for closer calls." *Id.* at 849, 118 S.Ct. 1708. These middle states of culpability "may or may not be shocking depending on the context." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535 (6th Cir. 2008).

.
*Id.* at 590.

8

Plaintiffs have identified four ways in which the Varnaus' conduct "shocks the conscience."   First, Plaintiffs claim that Dr. and Mr. Varnau's decision to abandon pieces of Jones' skull, abandon evidence, and leave the death scene unsecured shocks the conscience.   Plaintiffs rely on this Court's decision in *Culberson v. Doan*, 125 F.Supp.2d 252 (S.D.Ohio 2000).   However, the facts of that case are distinguishable from the case at hand.

In *Culberson*, this Court found that the plaintiffs' substantive due process rights were violated based on allegations that a police chief called off the search for a missing woman after search dogs hit on a pond.   *Id.* at 271.   The police chief knew that the family was desperately searching for the missing woman.   *Id.*   However, the police chief had been warned by the man suspected of her murder, Vincent Doan, that the pond contained evidence linking him to her murder.   *Id.*   The police chief allowed the pond to remain unguarded for twenty-four hours, which was enough time for someone to remove her body from the pond.   *Id.* at 271.   This Court noted that the police chief had in effect returned the body of the missing woman to her murderer.   *Id.*   This Court found that the police chief's "alleged intentional or reckless actions in allowing the pond in question to be unguarded for 24 hours, in order to allow the Baker Family or Doan enough time to permanently remove and secrete Carrie's body, are sufficiently brutal, demeaning, and harmful as to 'shock the conscience' of this Court."   *Id.* at 273.

Dr. and Mr. Varnau's decision to abandon pieces of Jones' skull, abandon evidence, and leave the death scene unsecured were certainly insensitive.   However, these acts are not the sort of egregious behavior that courts have found rise to the level of a substantive due process violation.   "Mutilation of a deceased family member's body,

desecration of the burial site and public display of death images are the kind of conduct that is likely to cause the family profound grief and therefore 'shocks the conscience' and 'offend[s] the community's sense of fair play and decency.'" *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1155 (9th Cir. 2012) (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952)); *see also Barrett v. Outlet Broad., Inc.*, 22 F. Supp. 2d 726, 744 (S.D. Ohio 1997) (changing position of the body of a suicide victim and altering the appearance of her bedroom in order to make her death look like a homicide for a news program "shocks the conscience"). Instead, these acts are in the area of "merely negligent tortious conduct" on the culpability spectrum, and therefore "categorically beneath constitutional due process." *See Range*, 351 F.3d at 590.

Next, Plaintiffs claim that the disrespect Dr. and Mr. Varnau showed toward Jones' loved ones shocks the conscience. When Plaintiffs asked Dr. Varnau to retrieve the pieces of Jones's skull and reunite them with his body, Dr. Varnau refused, telling them to just dig a hole to bury the pieces. Plaintiffs also allege that Mr. Varnau told them that "everybody loses someone every day." However, isolated offensive comments do not state a claim for violation of his substantive due process rights. *See Nuchols v. Berrong*, 268 F. App'x 414, 415 (6th Cir. 2008) (sheriff's one-time exaggerated threat to burn house down, set dog on fire and kill family members did not rise to level of constitutional violation).

Plaintiffs also claim that the mere presence and involvement of Dennis Varnau in Jones's death investigation shocks the conscience. Plaintiffs argue that were was no law enforcement, medical, or other governmental purpose for Dennis Varnau to be anywhere near a dead body in the custody of the Brown County coroner. However, as

10

Plaintiffs state in the Complaint, Dr. Varnau had delegated authority to Mr. Varnau to investigate death scenes.  (See Doc. 1, ¶ 56).  As coroner, Dr. Varnau may "appoint clerks, stenographers, custodians, and investigators and shall define their duties."  Ohio Rev. Code § 313.05 (A)(3).  Plaintiffs argue that even if Dr. Varnau properly appointed her husband, it is a violation of Ohio's nepotism laws.  However, as this Court has recognized, a violation of Ohio law is insufficient to establish a substantive due process violation.  *Pope v. Trotwood-Madison City Sch. Dist. Bd. of Educ.*, 162 F. Supp. 2d 803, 811 (S.D. Ohio 2000) (student's failure to receive prompt medical attention because coach lacked the CPR training required by Ohio law was not substantive due process violation) (citing *Collins v. Harker Heights*, 503 U.S. at 114, 129-130 (1992) (reasoning that defendants' violation of a duty imposed by state law failed to support a § 1983 claim premised upon a substantive due process violation); *Lewellen v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 34 F.3d 345, 347 (6th Cir. 1994) (finding no substantive due process violation, despite the fact that the defendants permitted construction of a building too close to a power line in violation of state law)).

Finally, Plaintiffs argue that the Varnau's prevention of an investigation into Hanson Jones's death shocks the conscience.   Plaintiffs explain that Dr. and Mr. Varnau, without any autopsy, gunshot analysis, gun residue analysis, forensic analysis, weapon testing, or useful witness interviews, determined Jones committed suicide.  Plaintiffs claim that the Varnaus declared the death a suicide in order to prevent the Sheriff from investigating the death scene.  Plaintiffs argue that the failure to conduct a meaningful death investigation due to an improper motive constitutes deliberate indifference and shocks the conscience.

The Sixth Circuit has explained that "[d]eliberate indifference in the constitutional sense requires that the officials knew of facts from which they could infer a 'substantial risk of serious harm,' that they did infer it, and that they acted with indifference 'toward the individual's rights.'" *Range,* 351 F.3d at 591 (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 513 (6th Cir. 2002) and citing *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) (government actor who has time to deliberate shocks the conscience if the actions "were taken with deliberate indifference towards the plaintiff's federally protected rights.")). The Sixth Circuit has explained further that:

> So, it is the entirety of the situation that must be assessed, including a defendant's awareness of the kind and degree of risk, and of the right threatened. For example, a prison official who has time to appreciate a known risk to an inmate's medical needs can shock the conscience by failing to provide medical care. *Lewis*, 523 U.S. at 850-51, 118 S.Ct. 1708. A police officer who has five hours to deliberate the known risks of bodily injury to hostages shocks the conscience by making a tactical decision to use tear gas and forced entry. *Ewolski*, 287 F.3d at 511-12. And an officer who has an opportunity to deliberate the risk to life shocks the conscience by placing a drunk woman in the passenger seat of a car with a drunk driver who is known to be violent. *Stemler v. City of Florence*, 126 F.3d 856, 862-63, 870 (6th Cir. 1997). In each case, the risk, *i.e.* the probability of harm, was substantial, the harm at issue was "serious," and there was evidence from which a jury could find that the defendants knew of the scope and substance of the risk. Thus, the type of harm, the level of risk of the harm occurring, and the time available to consider the risk of harm are all necessary factors in determining whether an official was deliberately indifferent.

*Id.* In this case, there are no allegations that there was a risk of bodily harm. Instead, Plaintiffs rely on this Court's decision in *Kammeyer v. City of Sharonville*, No. C-1-01-649, 2003 WL 25774000 (S.D. Ohio Feb. 13, 2003). In *Kammeyer*, this Court found that the repeated decision to cover-up the murders of two women, over a period of twenty years, amounted to deliberate indifference. *Id.* at *5 (citing *County of Sacramento v. Lewis*, 523 U.S. at 853 ("[w]hen such extended opportunities to do better are teamed with protracted

failure even to care, indifference is truly shocking"). This Court explained:

> It is shocking that the very authorities in whom Plaintiffs put their trust to conduct a murder investigation allegedly covered-up evidence pointing to the killer. It is further highly disturbing that the police allegedly led Plaintiffs to believe that the murders were being investigated, advised Plaintiffs that calling too often seeking progress reports would hurt the investigation, and misled the Plaintiffs that there was insufficient evidence to charge Schuholz.

*Id.* This Court explained that the allegations involved more than just a breach of duty on the part of a defendant. *Id.* Instead, there were "allegations of a cover-up willfully instigated by Defendants because of conflicts of interest." *Id.*

Here, Plaintiffs have not alleged that there was a cover-up of the true cause of Jones' death or that the cover-up continued for decades while family members were mislead about the cause of death. Instead, Plaintiffs claim that Dr. Varnau made a false determination that Jones's death was a suicide so as to prevent the sheriff from conducting further investigation. Similar false statements by officials have not been found to "shock the conscience*." See Johnson v. Barker*, 799 F.2d 1396, 1400 (9th Cir. 1986) (allegation that sheriff and prosecutors pursued baseless criminal charges for "political" reasons was not so egregious as to "shock the conscience"); *Cruz–Erazo v. Rivera–Montanez*, 212 F.3d 617 (1st Cir. 2000) (allegation that police officers verbally harassed and intimidated homeowners, occupied their property without permission, deliberately lied in official documents, and perjured themselves in official court proceedings with intention of causing homeowners harm did not sufficiently "shock the conscience" so as to violate substantive due process); *Cusick v. City of New Haven*, 145 F. App'x 701, 702-703 (2d Cir. 2005) ("Assuming arguendo that the plaintiffs' evidence was sufficient to demonstrate that the defendants intended to harm them by withholding

13

information from the North Haven police—a questionable supposition—this conduct still would not constitute the kind of heinous behavior recognized in the law as 'conscience-shocking.'").

Moreover, once Dr. Varnau decided the cause of death, that decision could be challenged under Ohio Revised Code. § 313.19, which provides that the cause of death as delivered by the coroner is the legally accepted cause of death, "unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death." *See also Vargo v. Travelers Ins. Co.*, 34 Ohio St.3d 27, 516 N.E.2d 226 (Ohio 1987) ("The coroner's factual determinations concerning the manner, mode, and cause of the decedent's death, as expressed in the coroner's report and death certificate, create a non-binding, rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary.").

Plaintiffs make a number of arguments in this Court as to why they did not believe that Jones' death was a suicide. While the Varnaus' failure to investigate some of the inconsistencies may have been negligent, their conduct does not "shock the conscience." Therefore, Plaintiffs have failed to state a substantive due process violation, and the Varnaus are entitled to qualified immunity on this claim.

### 5. Procedural due process

"To establish a procedural due process claim, a plaintiff must show that (1) it had a life, liberty, or property interest protected by the Due Process Clause; (2) it was deprived of this protected interest; and (3) the state did not afford it adequate procedural rights." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014) (citing *Women's Med.*

*Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)).  "Although property rights are principally created by state law, 'whether a substantive interest created by the state rises to the level of a constitutionally protected property interest is a question of federal constitutional law.'"  *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009) (quoting *Whaley v. County of Tuscola*, 58 F.3d 1111, 1114 (6th Cir. 1995)).

Plaintiffs claim they have a property interest in Jones' remains.   Plaintiffs claim Dr. and Mr. Varnau "meddled with" Mr. Jones's body by leaving large pieces of his skull and skull fragments at the scene and treating his body parts with disrespect.   (Doc. 25, ¶¶ 1, 23-24, 27, 45).

One Ohio appellate court has recently conducted a comprehensive review of the concept of property rights in a decedent's body under Ohio and federal law.   *Granato v. Davis*, 2014 WL 7224556 (Ohio Ct. App. Dec. 19, 2014).   The court concluded that based on this review "it would be difficult to conclude that a property right sufficient to invoke the protection of the Fourteenth Amendment existed."   *Id.* at *15.   The court held that because this right was not "clearly established," the coroner was entitled to qualified immunity from a Section 1983 claim brought after the wrong body was delivered to the family of the decedent.   This Court finds this analysis persuasive and adopts it as its own.

Therefore, the Court concludes that the Varnaus are entitled to qualified immunity from Plaintiffs' procedural due process claim under Section 1983 because the law regarding constitutionally protected property rights in a decedent's body was not clearly established in August of 2013.

### 6. State law claims

Plaintiffs have brought claims against the Varnaus for intentional and negligent

emotional distress under Ohio law.  The Varnaus argue that Plaintiffs have not plead adequate facts to support these claims.

To state a claim for intentional infliction of emotional distress, a plaintiff must allege that (1) that the defendant either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable man could be expected to endure it.  *Pyle v. Pyle*, 11 Ohio App. 3d 31, 34, 463 N.E.2d 98, 103 (Ohio 1983) (citations omitted).

While Ohio does not recognize a claim for negligent infliction of serious emotional distress where the distress is caused by the plaintiff's fear of a nonexistent physical peril, Ohio courts have recognized an exception to the "actual-peril requirement" in cases involving the mishandling of a corpse.  *Range v. Douglas*, 878 F. Supp. 2d 869, 895 (S.D. Ohio 2012) (citing *Heiner v. Moretuzzo*, 73 Ohio St.3d 80, 652 N.E.2d 664, 670 (Ohio 1995) and *Chesher v. Neyer*, 392 F. Supp. 2d 939, 953 (S.D. Ohio 2005)).

To the extent that Plaintiffs' claims are based on learning that Jones died of suicide, in *Hanly v. Riverside Methodist Hospital*, the court explained that a defendant "is not liable for plaintiff's emotional distress if defendant does no more than 'insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.'"  78 Ohio App. 3d 73, 82, 603 N.E.2d 1126, 1132 (Ohio Ct. App. 1991) (quoting *Uebelacker v. Cincom Systems, Inc.*, 48 Ohio App.3d 268,

277, 549 N.E.2d 1210, 1220 (Ohio Ct. App. 1988)); *see also* 1 Restatement of the Law 2d, Torts (1965), 76, Section 46, Comment g ("A and her children are destitute, ill, and unable to pay their rent.   B, their landlord, calls on A and threatens to evict her if the rent is not paid.   Although B's conduct is heartless, he has done no more than the law permits him to do, and he is not liable to A for her emotional distress.).

For example, in *Scott v. Spearman*, the court found that a surviving spouse who had a legal right to have the decedent disinterred could not be found to have intentionally inflicted emotional distress.   115 Ohio App. 3d 52, 58, 684 N.E.2d 708, 712 (Ohio Ct. App. 1996); *see also Sears Roebuck & Co. v. Swaykus*, 2002 WL 31859516, *2 (Ohio Ct. App. Dec. 11, 2002) (knowingly filing a false complaint, without more, is insufficient to demonstrate extreme and outrageous conduct required to support intentional infliction of emotional distress claim).

Learning of Jones's death certainly caused Plaintiffs emotional distress. However, by statute, Dr. Varnau was required to determine the "cause of death and the manner and mode in which the death occurred."   Ohio Rev. Code § 313.19.   Dr. Varnau was also required by statute to notify any known relatives of Jones' death.   Ohio Rev. Code § 313.14 ("The coroner shall notify any known relatives of a deceased person who meets death in the manner described by section 313.12 of the Revised Code by letter or otherwise.").   Therefore, Dr. Varnau's determination regarding the cause of death cannot form the basis of an intentional or negligent infliction of emotional distress claim.

The Court also finds that the comments made by the Varnaus—that Plaintiffs should dig a hole to bury pieces of Jones' skull and that "everybody loses someone every day"—are not so extreme and outrageous "as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 374-375, 453 N.E.2d 666, 671 (Ohio 1983).  *Accord Curry v. Blanchester*, 2010 WL 2807948, *8 (Ohio Ct. App. July 19, 2010) (mayor's comments that employee was "tits and no brain" and was having an affair with police chief are not actionable under intentional infliction of emotional distress claim; while the comments are inconsiderate and clearly inappropriate, they fall short of being "outrageous," "extreme," or "utterly intolerable").

To the extent that Plaintiffs' emotional distress claims are based upon the Varnaus leaving behind pieces of Jones' skull at the death scene, Ohio courts have concluded that similar instances of negligent mishandling of a corpse did not rise to the level outrageous and egregious acts which would support a claim for emotional distress.  *See*, *e.g.*, *Winkle v. Zettler Funeral Homes, Inc.*, 182 Ohio App. 3d 195, 208-209, 912 N.E.2d 151, 161 (Ohio Ct. App. 2009) (claims for negligent and intentional infliction of emotional distress not supported where plaintiffs learned that their mother's body had, in fact, not been buried as originally believed, but instead, had been inadvertently left, albeit undisturbed, in the morgue cooler) (and cases cited therein); *cf. Carney v. Knollwood Cemetery Assn.* (1986), 33 Ohio App.3d 31, 514 N.E.2d 430 (Ohio Ct. App. 1986) (emotional distress claim supported where cemetery workers deliberately and recklessly continued to dig in a grave even after they hit an old wooden vault, and then proceeded to throw the vault and its broken remains into a refuse heap, including the decomposed body of plaintiffs' long-deceased grandmother).  Accordingly, the Court finds that Plaintiffs have failed to state a claim for either intentional or negligent infliction of emotional distress.

C. **Brown County Defendants**

1. **Municipal liability**

For a county to be liable under 42 U.S.C. § 1983 for a deprivation of constitutional right, a plaintiff must show that the alleged injuries were inflicted pursuant to a governmental custom, policy or practice. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018 (1978). Therefore, a plaintiff must establish two basic elements: (1) that a constitutional violation occurred; and (2) that the County "is responsible for that violation." *Doe v. Claiborne Cty.*, 103 F.3d 495, 505-506 (6th Cir. 1996).

This Court has concluded that Plaintiffs have failed to plead a substantive due process claim against Dr. Varnau. Absent an underlying constitutional violation against an individual Defendant, Plaintiffs' *Monell* claim against the County fails. *Scott v. Clay County, Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000) ("[O]ur conclusion that no officer-defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well."); *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571 (1986) ("[I]f [the police officer] inflicted no constitutional injury on respondent, it is inconceivable that [the city] could be liable to respondent.").

However, the Court concluded that Dr. Varnau is entitled to qualified immunity from Plaintiffs' procedural due process because the law regarding constitutionally protected property rights in a decedent's body was not clearly established in August of 2013. Therefore, Plaintiffs have a potential substantive due process claim against the County. *Accord Doe v. Sullivan County*, 956 F.2d 545, 554 (6th Cir. 1992) ("the dismissal of a claim against an officer asserting qualified immunity in no way logically entails that the

plaintiff suffered no constitutional deprivation, nor, correspondingly, that a municipality (which, of course, is not entitled to qualified immunity) may not be liable for that deprivation.").

"Municipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83, 106 S.Ct. 1292 (1986)). Whether an official is a "policymaker" is a question of state law. *Id.*

In *Jorg v. City of Cincinnati*, the Sixth Circuit found that a county coroner is not acting as a policymaker when determining and reporting causes of death. 145 F. App'x 143, 147 (6th Cir. 2005). The court noted that state law "clearly mandates that the Coroner must determine the cause of death." *Id.* (citing Ohio Rev. Code Ann § 313.09). The court explained that "[w]hen municipal officials have been deemed to be making policy decisions in the past, it has not been because they were vested with the authority to make factual assessments of a particular situation, but rather, because they were vested with the authority to respond to that situation." *Id.* at 146-47. "Accordingly, there is a distinction between "policymaking" authority, which entails a certain amount of discretion to choose among various plausible alternatives, and 'factfinding' authority, which involves assessing the fixed realities of a situation." *Id.* (citing Merriam Webster's Collegiate Dictionary 416 (1995) (defining "fact finder" as "one that tries to determine the realities of a case, situation . . . an impartial examiner designated by a government agency to appraise the facts underlying a particular matter")). The court explained that while certain activities of the coroner might constitute policymaking, determining the cause of death is not one of them. *Id.* at 147.

20

Plaintiffs distinguish their claim from the one alleged in *Jorg* because it is not based on Dr. Varnau's determination of cause of death. Instead, Plaintiffs argue that Dr. Varnau exercised her policymaking authority by refusing the Sheriff a standing permissive order, refusing a permissive order at the scene of Jones' death, failing to establish protocols for handling death scenes, allowing her husband to act on behalf of the coroner's office, and using the coroner's office to further her family feud with the Sheriff.

The Court notes that Ohio Revised Code § 313.11 provides that "[n]o person, without an order from the coroner, any deputy coroner, or an investigator or other person designated by the coroner as having authority to issue an order under this section, shall purposely remove or disturb the body of any person who has died" as the result of criminal or other violent means, by casualty, by suicide, or in any suspicious or unusual manner. This statute has been interpreted to give the coroner:

> control over the scene of an unexplained death for as long as he [or she] deems this control to be necessary. Accordingly, until the coroner completes his [or her] investigation of the scene, local law enforcement officers must have the coroner's permission to secure evidence and conduct investigations within the area of the coroner's control.

1988 Ohio Op. Att'y Gen. No. 88-035 (June 15, 1988).

However, even if a county coroner is vested with the authority to make these types of decisions, "[m]ere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir.1993) (citing *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915). "Discretion to act is not to be confused with

21

policymaking authority; no municipal liability results where an official merely has discretion to act because subjecting a municipality to liability in such a situation would be 'indistinguishable' from respondeat superior liability."   *Id.* (citation omitted).

Moreover, Dr. Varnau's misuse of her power to advance a private agenda does not create a "policy or custom" of the county.   In *Wooten v. Logan*, the Sixth Circuit held that a rape committed by a county sheriff could not be considered part of the county's "policy or custom."   92 Fed.Appx. 143, 145-47 (6th Cir. 2004).   The "hostility and political strife" between Dr. Varnau and the Brown County Sheriff and its damaging effects have been addressed elsewhere.   *See Adamson v. Varnau*, 2014 WL 7390121, *4 (Ohio Ct. App. Dec. 30, 2014) ("Simply stated, these battles do not serve the best interests of the Brown County citizenry and project an overwhelmingly negative light on all of those involved. This could be no more evident than when dealing with matters following a death and the loss of a loved one, as is painfully evident when reviewing the extensive trial testimony presented here.").   Therefore, the Court concludes that Plaintiffs cannot maintain a substantive due process claim against the County.

**III.**    **CONCLUSION**

Based on the foregoing, Defendants Brown County, OH/Brown County Ohio Commissioners' Motion to Dismiss (Doc. 27) is **GRANTED**; and Defendants Dennis Varnau and Judith A. Varnau's Motion to Dismiss (Docs. 28, 30) is **GRANTED**.   Plaintiffs' claims are **DISMISSED with PREJUDICE**.   This matter is **CLOSED and TERMINATED** from the active docket of this Court.

**IT IS SO ORDERED.**

_____ /s/ Michael R. Barrett_____
Michael R. Barrett
United States District Judge

23